## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| Chevron U.S.A. Inc., <br><br>                         *Plaintiff*, <br><br>         v. <br><br> BNSF Railway Company, CSX Transportation, Inc., Norfolk Southern Railway Company, and Union Pacific Railroad Company, <br><br>                     *Defendants.* | **JURY TRIAL DEMANDED** <br><br><br> **COMPLAINT** <br><br> CASE NO. 4:21-CV-150 |

Plaintiff Chevron U.S.A. Inc. ("CUSA") alleges as follows:

## NATURE OF THE ACTION

1.  This is an antitrust action alleging that the four largest United States-based Class I railroads engaged in price fixing, in violation of Section 1 of the Sherman Act.

2.  Defendants BNSF Railway Company ("BNSF"), Union Pacific Railroad Company ("UP"), CSX Transportation, Inc. ("CSX"), and Norfolk Southern Railway Company ("NS") (together, "Defendants") conspired to fix, raise, maintain, and/or stabilize prices of rail freight transportation services sold in the United States by imposing a uniform "rate-based" rail fuel surcharge ("FSC"), which was calculated as a percentage of the base rate for a shipment, charged by the railroads in addition to the base rate, purportedly to compensate for the cost of fuel. Through their collective action, Defendants conspired to impose FSCs that far exceeded any increases in the Defendants' fuel costs and thereby collected billions of dollars of additional profits between July 1, 2003 and December 31, 2008 (the "Relevant Period").

3.     Defendants' conspiracy has been the subject of class action litigation for several years.  *See In re Rail Freight Fuel Surcharge Antitrust Litigation* ("*Rail Freight*"), 292 F. Supp. 3d 14 (D.D.C. 2017).  While denying class certification, the U.S. District Court for the District of Columbia noted that the "documentary evidence is strong evidence of conspiracy and class-wide injury."  *Id.* at 32.  That court found that the "evidence of conspiracy and defendants' intent to uniformly apply and enforce new, more aggressive fuel surcharges is substantial."  *Id.* at 102.  The court specifically found that there was "substantial documentary evidence that indicates that defendants (1) created new, aggressive fuel surcharge formulas for carload traffic; (2) intended to apply their fuel surcharge programs as widely as possible to all or virtually all of their customers through new policies; and (3) viewed their fuel surcharge programs as profit centers."  *Id.* at 103.

4.     Defendants' imposition of uniform FSCs faced a significant hurdle because Defendants already had a well-established and reliable mechanism for recovering their fuel costs. As of 2003, the vast majority of rail freight transportation agreements included rate escalation provisions based on an index called the All-Inclusive Index ("AII"), which weighted a variety of cost factors, including fuel.  The AII already permitted full recovery by the railroads of actual fuel cost increases.

5.     To surmount this obstacle, Defendants BNSF, UP, CSX, and NS devised and embarked upon a scheme to remove fuel as a factor from the AII, thus allowing them to impose separate, stand-alone FSCs.  A railroad trade organization called the Association of American Railroads ("AAR") published the AII.  Defendants control and dominate the AAR, and the CEOs of each defendant railroad are members of the AAR's board.  Through their collective action, Defendants caused the AAR to publish a new cost escalation index called the All-Inclusive Index Less Fuel ("AIILF") that did not include a fuel component.

6.     The AAR's adoption and publishing of the AIILF as a result of Defendants' collective action paved the way for Defendants' widespread implementation of new FSCs. Defendants deployed these FSCs systematically, aggressively, and uniformly.  These FSCs were based on mutually agreed formulas that allowed Defendants to charge identical surcharge rates month after month.  As the D.C. District Court noted, "[t]he evidence shows that defendants employed these fuel surcharges in lockstep" and "sought to apply fuel surcharges to as many customers as possible."  *Rail Freight*, 292 F. Supp. 3d at 104.  These new "fuel surcharges" were not tied to the actual cost of fuel.  Instead, they were calculated as a percentage increase on the total base rate of freight transportation, allowing the "fuel surcharges" to function as an across-the-board increase on freight prices.

7.     As a direct and proximate result of Defendants' price fixing conspiracy, Defendants restrained competition in the market for rate-unregulated rail freight transportation services and injured CUSA in its business and property.  CUSA paid a higher price for unregulated rail freight transportation than it would have paid absent Defendants' concerted unlawful activity.

8.     CUSA seeks damages for excessive rates imposed as a result of Defendants' conspiracy on rail freight shipments made under private transportation contracts and through other means exempt from rate regulation under federal law.

## PARTIES

9.     Plaintiff CUSA is a corporation organized under the laws of the State of Pennsylvania, with its principal place of business at 6001 Bollinger Canyon Road, San Ramon, California 94583.  CUSA engages in all branches of the petroleum industry, including those related to exploration and production of crude oil, natural gas, and natural gas liquids and those associated with the refining, marketing, supply, and distribution of petroleum products, as well as mineral,

geothermal and other energy activities. CUSA's operations are carried out through various divisions.

10. During the Relevant Period, CUSA purchased unregulated rail freight transportation services directly from Defendants to transport raw materials and finished products to and from its facilities and to its customers.

11. As a proximate result of the conspiracy described herein, CUSA paid FSCs in connection with the unregulated rail freight transportation services obtained from Defendants that it would not have paid in the absence of the conspiracy. Therefore, the prices that CUSA paid to Defendants during the Relevant Period for those unregulated rail freight transportation services on which FSCs were imposed were greater than the prices that CUSA would have paid absent the conspiracy alleged herein. CUSA has therefore been injured in its business and property by reason of Defendants' antitrust violations.

12. Defendant BNSF has its principal place of business at 2650 Lou Menk Drive, Fort Worth, Texas 76131. BNSF is a major freight railroad operating primarily in the western United States. BNSF has railway lines throughout the western United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

13. Defendant CSX has its principal place of business at 500 Water St., Jacksonville, Florida 32202. CSX is a major freight railroad operating primarily in the eastern United States and Canada. CSX has railway lines throughout the eastern United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

14.     Defendant NS has its principal place of business at Three Commercial Place, Norfolk, Virginia 23510.  NS is a major freight railroad operating primarily in the eastern United States.  NS has railway lines throughout the eastern United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

15.     Defendant UP has its principal place of business at 1400 Douglas Street, Omaha, Nebraska 68179.  UP is a major freight railroad operating primarily in the western United States. UP has railway lines throughout the western United States and maintains coordinated schedules with other rail carriers to handle freight to and from other parts of the country (including in this District).

## JURISDICTION AND VENUE

16.     CUSA brings this action under Section 4 of the Clayton Act, 15 U.S.C. § 15, to recover treble damages and reasonable attorneys' fees and costs from Defendants for the injuries sustained by CUSA by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

17.     This Court has jurisdiction under 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

18.     Venue is proper in this judicial District under 15 U.S.C. §§ 15(a) and 22, as well as 28 U.S.C. § 1391.  During the Relevant Period, one or more of the Defendants resided, transacted business, were found, or had agents in this District.  A substantial part of the events giving rise to CUSA's claims occurred in this District.  A substantial portion of the affected interstate trade and commerce described below was carried out in this District.

19.     This Court has personal jurisdiction over each Defendant because each Defendant transacted business in this District, directly or indirectly sold and delivered rail transportation

services in this District, has substantial aggregate contacts with this District, and engaged in an illegal price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business in this District.

## INTERSTATE TRADE AND COMMERCE

20.     Defendants' unlawful activities had a direct, substantial, and reasonably foreseeable effect on interstate commerce.

21.     During the Relevant Period, Defendants accounted for over 90% of all rail shipments within the United States.

22.     The activities of Defendants and their co-conspirators were within the flow of, and substantially affected, interstate commerce.  Defendants sold and carried out rail shipments in a continuous and uninterrupted flow of interstate commerce to shippers and customers throughout the United States.  Defendants and their co-conspirators used instrumentalities of interstate commerce to sell and market rail freight transportation services.

## DEREGULATION OF THE RAILROAD INDUSTRY

23.     Congress deregulated the railroad industry when it passed the Staggers Rail Act of 1980 ("Staggers Act").  The Staggers Act caused a dramatic change in the evolution of U.S. railroads.  After decades of regulatory control over virtually every aspect of railroads' economic operations, the Staggers Act freed the railroads to set market rates for rail freight transportation.

24.     Before the Staggers Act, freight railroads generally would only charge the published tariff rates that the railroads filed with the Interstate Commerce Commission ("ICC").  During this pre-Staggers Act time period, railroads could apply to the ICC for across-the-board rate increases, which could lawfully be implemented on a collective basis.

25.     Today, by contrast, 80% or more of all rail shipments move under private transportation contracts, which are not rate-regulated or are otherwise exempt from rate regulation. For this rate-unregulated traffic, the railroads cannot turn to a government agency to obtain across-the-board increases in freight rates, nor can the railroads lawfully collude to set those rates.

26.     The number of Class I railroads declined dramatically after passage of the Staggers Act, falling from 35 railroads to just seven railroads today (two of which are owned by Canadian entities).  The railroad industry is now (and was during the Relevant Period) highly concentrated: four of these railroads—Defendants BNSF, UP, CSX and NS—operate more than 90% of all railroad track in the United States and, in 2006, accounted for nearly $50 billion in total annual revenue.  Because there are high fixed costs and significant barriers to entry in the railroad industry, there is only a fringe or niche market of smaller carriers, and those carriers provide only negligible competition.  This highly concentrated market structure, protected by high barriers to entry, provided Defendants with an environment conducive to anticompetitive conduct.

27.     Congress deregulated the railroad industry in large part to try to promote competition and reduce freight rates.  But Defendants took advantage of the oligopolistic structure of their industry by conspiring to charge shippers supracompetitive rates.

**DEFENDANTS INTRODUCE FUEL SURCHARGES**

28.     By the early 2000s, the railroad industry had consolidated to the point where further mergers were unlikely, if not impossible.  In March 2000, in response to a proposed merger between Defendant BNSF and Canadian National Railway Co., the Surface Transportation Board ("STB"), the successor to the ICC, imposed a moratorium on new mergers.  The STB then promulgated more standards for merger review, effectively cutting off further consolidation as an avenue for revenue growth.

29.     In this environment, Defendants lacked the legal means to implement a traditional across-the-board price increase.  Due to deregulation, Defendants could no longer turn to the ICC, or later to the STB, for across-the-board rate increases, nor could Defendants unilaterally raise rates without losing market share to their competitors.

30.     Faced with the threat of competition from one another, Defendants could not unilaterally raise prices using FSCs or through other means.  As BNSF noted in a 2002 internal report, "our rail competitors do not [use fuel surcharges,] and we therefore are hard pressed to achieve it." *Rail Freight*, 292 F. Supp. 3d at 103.  In a January 2003 memo, BNSF Chief Marketing Officer Chuck Schultz noted that "any increase in fuel surcharges would result in a decrease in prices of the same amount in order to remain competitive." *Id.* at 104.

31.     Unlike the risk of competition with each other, Defendants were well protected from outside competition.  The railroad industry's significant barriers to entry—such as high fixed costs required to create and maintain railroad infrastructure—gave Defendants a large competitive advantage over potential new entrants.  Defendants' businesses were concentrated in commodities and distances over which rail is the most cost-efficient mode of transportation, significantly reducing the risk of competition from non-railroad competitors.

32.     Defendants were protected from the threat of competition from outsiders but were not able to raise prices unilaterally without ceding market share to each other.  The only practicable way for Defendants to increase prices across the board without sacrificing short-term revenues was through a uniform surcharge applied to as many customers as possible.  Under the guise of addressing rising fuel prices, Defendants conspired to create and implement FSCs, which effectively operated as across-the-board rate increases.

8

33.     After passage of the Staggers Act, railroads increasingly entered into private freight transportation contracts that included cost escalation provisions tied to the AII and the Rail Car Adjustment Factor ("RCAF"), which is based on the AII.  The AAR published both the RCAF and the AII, and both indices included fuel costs as a factor.  The AII and RCAF weighted a number of cost factors—labor, fuel, materials and supplies, equipment rents, depreciation, interest, and other expenses—so that the actual impact of particular cost increases, such as for fuel, would be reflected in the index.  The AII and RCAF would capture any actual increase in fuel costs no matter how small or large.  The indices and the weighted factors within them were designed for this purpose.

34.     In 2003, BNSF, UP, CSX, and NS seized upon fuel as the means to create the type of across-the-board rate increases that the railroads could no longer achieve through a regulatory process.  Defendants embarked on and implemented an agreed plan to remove fuel costs from the AII (and thus from the RCAF based on the AII) so that Defendants could apply separate FSCs.  Defendants controlled and dominated the AAR and conspired to cause it to publish the AIILF.  This new index no longer weighted fuel against other cost factors, allowing Defendants to use the separate "fuel surcharges" to raise total freight prices by a given percentage—and that is precisely what Defendants proceeded to do.

35.     Before 2003, at least some Defendants imposed FSCs on private rail freight transportation, but Defendants applied these FSCs only in isolated instances, and each Defendant had different surcharge rates, reflecting, among other things, the differing fuel costs of each railroad.  At that time, such FSCs were the exception, and railroads widely used the AII and RCAF to capture fuel and other costs.  Defendants, then acting unilaterally and without the benefit of coordination, faced difficulties forcing shippers to accept FSCs in the face of competition.  As a

result, before July 2003, Defendants did not consistently apply FSCs to all contracts and often modified or waived FSCs in exchange for base rate increases.

### DEFENDANTS CONSPIRE TO RAISE PRICES THROUGH RAIL FUEL SURCHARGES

36.     In 2003, Defendants took a series of coordinated actions to switch to a new system that would allow the uniform, widespread use of FSCs, not as a cost-recovery device but as a revenue-enhancement mechanism.

37.     Starting in spring 2003, Defendants' senior executives engaged in an extraordinary series of in-person meetings, phone calls, and email communications concerning the establishment of a new FSC program.  The purpose of these communications was to discuss, and agree upon, FSC policies and practices intended to apply across the board to shippers industry-wide.

38.     In early March 2003, CSX and UP examined their FSCs together.  CSX first internally proposed changes to its FSC program, while UP's Chief Marketing Officer Jack Koraleski drafted a revised FSC recommendation for UP.  Class Cert. Tr., 98:15-19, *Rail Freight*, No. 1:07-mc-00489-PLF-GMH (Oct. 6, 2010) ("Oct. 6, 2010 Tr.").  But on March 12 and 13, 2003, UP's Koraleski attended a meeting with CSX; the agenda reflected that Koraleski and CSX Executive Vice President Clarence Gooden had discussed "fuel surcharge methodology" even before this meeting.  *Id.* at 98:20-99:2.

39.     On March 20, 2003, within one week of UP's Koraleski's meeting with CSX, CSX abandoned its internally proposed FSC program and instead announced a plan that matched Koraleski's recommendation for UP.  *Id.* at 99:3-8.  On March 31, 2003, UP adopted Koraleski's FSC program.  *Id.* at 99:14-17.

40.     BNSF and NS also began discussing changes to their FSC programs around this time.  During a March 18, 2003 meeting, BNSF and NS representatives discussed whether BNSF's

fuel surcharge should "be synchronized with the other big players in the industry." *Id.* at 58:14-59:2; Class Cert. Tr., 349:25-350:2, *Rail Freight*, No. 1:07-mc-00489-PLF-GMH (Sept. 27, 2016) ("Sept. 27, 2016 Tr.").  Not long after, at biannual meetings of the National Freight Transportation Association, executives of Defendants met to consider and discuss developments in the railroad industry.  The spring 2003 meeting of the National Freight Transportation Association occurred from April 2 to 6 at the Wigwam resort in Litchfield Park, Arizona.  There, BNSF and NS continued their discussion of synchronizing the industry.  BNSF Chief Marketing Officer John Lanigan and NS Chief Marketing Officer Don Seale discussed FSC programs.  Oct. 6, 2010 Tr. at 102:1-1.

41.     Other meetings among Defendants' executives also laid the groundwork for the conspiracy.  On or around April 1, 2003, BNSF's Lanigan and CSX Chief Marketing Officer Michael Giftos met in Jacksonville, Florida to discuss "fuel surcharge."  Oct. 6, 2010 Tr. at 101:10-15.  At a May 14, 2003 meeting, NS and UP recognized that "fuel surcharges, if . . . uniformly applied across the industry would be helpful."  Sept. 27, 2016 Tr. at 350:2-5.  These discussions soon began to translate into concrete actions.

42.     As early as July 2003, BNSF and UP (together, the "Western Railroads"), began to coordinate their FSCs.  Before this time, UP had adjusted its fuel surcharge monthly based on the price of West Texas Intermediate crude oil settled in Cushing, Oklahoma ("WTI Index"), while BNSF had based its fuel surcharge on the U.S. Department of Energy On-Highway Diesel Fuel Price Index ("HDF Index").  But in or about July 2003, UP switched to the HDF Index pursuant to an agreement with BNSF.  From that point on, the Western Railroads moved in lockstep and charged the exact same FSC percentage each month of the Relevant Period.  BNSF and UP

calculated these FSCs as a percentage increase on the total cost of the freight transport, regardless of the actual cost of fuel for the transport job.

43.     The Western Railroads agreed to administer their HDF Index-based FSCs in precisely the same way.  If the HDF Index measured the U.S. average price of diesel fuel as equal to or lower than $1.35 per gallon, the Western Railroads did not apply a surcharge.  When the HDF Index exceeded $1.35 per gallon, however, the Western Railroads both applied a surcharge of 0.5% of the total base rate for every five-cent increase above $1.35 per gallon.  For example, if the HDF Index rose to $1.55 per gallon, the Western Railroads would apply a surcharge of 2% of the total base rate.

44.     The Western Railroads also coordinated when they would change their fuel surcharge.  They agreed that they would apply the FSC to shipments beginning the second calendar month after a change in the HDF Index average price calculation.  For example, if the HDF Index average price changed in January, the Western Railroads would announce their new FSC percentage on February 1 (always on the first day of the month), and then apply the surcharge to shipments in March.  The Western Railroads published their monthly fuel surcharge percentages on their websites, making any deviation from cartel pricing easily detectable.

45.     The Western Railroads' agreed-upon coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including using the HDF Index, setting the trigger point at $1.35 per gallon of diesel fuel, and applying the FSC in the second calendar month after the HDF Index average price changed.  These similarities are both too precise and too comprehensive to be independent responses to any common market phenomenon that Defendants were facing.

46.     UP's adoption of the same fuel price index as BNSF in July 2003 is striking evidence of concerted conduct.  Two months earlier, UP had announced an entirely different modification to its then-existing fuel surcharge program:  In April 2003, UP modified the trigger points it used for adjusting surcharges in its program but did not change the index it employed. The fact that, just two months later, UP switched indices and began charging exactly the same FSCs as BNSF indicates that UP's switch was the result of concerted conduct with BNSF.

47.     Even after agreeing to coordinate their fuel surcharges, the Western Railroads still faced a significant barrier to widespread use of fuel surcharges.  Most shipment contracts contained cost-escalation provisions that already accounted for fuel costs.  Defendants agreed to solve this problem by conspiring to remove fuel from widely used cost escalation indices, paving the way for widespread imposition of the new FSC program in which all four Defendants could participate and from which they could enjoy excessive profits.

48.     In fall 2003, the Western Railroads initiated an effort to get all Defendants to agree to remove fuel costs as a factor from the AII (and thus the RCAF based on the AII) so that they could more easily charge artificially high FSCs as a revenue-enhancement mechanism.

49.     Defendants dominated the AAR board and caused the AAR to announce in December 2003 the creation of an unprecedented index that excluded fuel, the AIILF.  The AIILF "removed fuel costs from the prior cost escalation index, the [AII], upon which the RCAF was based." *Rail Freight*, 292 F. Supp. 3d at 37.  This decision to create the new fuel-excluded index were the product of Defendants' collective action and could not have been accomplished without the conspiracy.  The new AIILF specified the fourth quarter of 2002 as its base period.

50.     Defendants conspired to cause the AAR to inaugurate the AIILF so that they could begin assessing separate, stand-alone FSCs, applied against the total cost of rail freight

transportation, and coordinate that practice.  The creation of this new index was an important, carefully planned step that Defendants took collectively to allow implementation and continuation of their price-fixing conspiracy—a conspiracy to widely impose FSCs against the entire cost of rail freight transportation and thereby obtain additional revenues far beyond any actual increases in fuel costs.

51.     Never before in the AAR's history had it created a cost escalation index without a fuel component.  This action was a notable departure from the established practice in the industry. In a March 15, 2005 letter, BNSF Chief Economist Sam Kyei noted that "[i]n my 18-year railroad career, no one had ever succeeded in steering the A.A.R. to do this," and claimed that "this index and a fuel surcharge should tremendously help our bottom-line for years to come.  In fact[,] the entire rail industry should benefit." *Rail Freight*, 292 F. Supp. 3d at 37.

52.     BNSF has admitted that it worked through the AAR to accomplish this revenue-generating measure in 2003.  BNSF's Kyei stated that BNSF CEO Matthew K. Rose "single-handedly got the A.A.R. to establish a non-fuel RCAF index, now called the All–Inclusive Index Less Fuel." *Id.*

53.     Almost immediately after the announcement in December 2003 of the new AIILF, and pursuant to the conspiracy, Defendants CSX and NS (together, the "Eastern Railroads"), suddenly moved into lockstep with FSCs based on the WTI Index.  This move into lockstep was part and parcel of, and flowed from, the agreements reached and implemented by Defendants in late 2003.

54.     Specifically, the Eastern Railroads agreed to apply an FSC whenever the monthly average WTI price exceeded $23 per barrel of crude oil.  The Eastern Railroads increased their

rates by 0.4% for every $1 that the price of WTI oil exceeded $23 per barrel.  For example, if the price of WTI oil was $28 per barrel, the fuel surcharge percentage would be 2%.

55.     The Eastern Railroads also adopted the same timing for changing their FSCs as the Western Railroads, changing their FSCs two calendar months after the WTI Index had adjusted.  For example, if the WTI average price exceeded $23 per barrel in January, the Eastern Railroads would assess the applicable FSC percentage to all bills of lading dated in the month of March.  In this way, Defendants could apply the exact same FSC percentage month after month.  Like the Western Railroads, the Eastern Railroads published their monthly FSC percentages on their websites, making any deviation from cartel pricing easily detectable.

56.     The Eastern Railroads' coordination is reflected in their simultaneous selection and adoption of the same novel, arbitrary, and complex combination of features for their FSC programs, including using the WTI Index, setting the trigger point at $23 per barrel, and applying the FSC in the second calendar month after the average price of WTI oil had changed.  These similarities, and the coordination with the Western Railroads, are too precise and too comprehensive to have been independent responses to any common market phenomenon that Defendants were facing.

57.     There was no legitimate business justification or natural explanation for the collective action of Defendants to cause the AAR to adopt and publish the AIILF or collectively to adopt rate-based FSCs.  Such "revenue-based" fuel surcharges bore no direct relationship to Defendants' actual increase in fuel costs.  Thus, the FSC program was not a cost-recovery mechanism but, instead, a revenue-enhancement measure that could only have been accomplished by Defendants' conspiratorial action of removing fuel from widely used cost escalation indices.  The AII and RCAF both included a fuel-cost component, and Defendants had used these indices

for decades to measure fuel-cost increases. As an empirical matter, the fuel component of the AII and RCAF would have permitted Defendants to recover all of their increased fuel costs throughout the conspiracy period. Thus, Defendants' motivation in collectively causing the adoption of the AIILF could not have been more accurate or more efficient fuel cost recovery. Defendants' actions were not independent responses to a common problem of increasing fuel costs.

58.     As a result of Defendants' concerted action, prices of rail freight transportation services and FSCs charged to rail shippers and customers like CUSA were raised to or maintained at supracompetitive levels during the Relevant Period.

## IMPLEMENTATION OF THE PRICE-FIXING SCHEME

59.     As detailed above, Defendants agreed in 2003 to remove fuel from the AII and RCAF. This allowed Defendants to apply separate FSCs as a percentage-multiplier of the base rate charged for rail freight transportation, effectively imposing an across-the-board rate increase that raised revenue far beyond the actual costs of fuel (which could have been recovered through the AII and RCAF). Defendants applied these surcharges not only to published tariff rates but to the private contracts and other traffic not subject to rate regulation under federal law.

60.     Pursuant to the conspiracy, the Western Railroads used the HDF Index, moved in lockstep, and charged identical FSCs on a monthly basis throughout the Relevant Period. The chart below shows that the FSC percentages charged by the Western Railroads for freight shipments varied before the Relevant Period began but were identical starting in July 2003.

**Monthly Surcharge Percentages – Western Railroads**

| Month | BNSF | UP |
|--------|------|------|
| Jun-02 | 1.0% | 0.0% |
| Jul-02 | 1.0% | 0.0% |
| Aug-02 | 0.0% | 0.0% |
| Sep-02 | 0.0% | 0.0% |
| Oct-02 | 1.0% | 0.0% |

| Month | BNSF | UP |
|---|---|---|
| Nov-02 | 2.0% | 0.0% |
| Dec-02 | 2.5% | 0.0% |
| Jan-03 | 2.0% | 2.0% |
| Feb-03 | 2.0% | 2.0% |
| Mar-03 | 2.5% | 2.0% |
| Apr-03 | 4.5% | 2.0% |
| May-03 | 2.0% | 2.0% |
| Jun-03 | 3.0% | 2.0% |
| **Jul-03** | **2.5%** | **2.5%** |
| Aug-03 | 2.0% | 2.0% |
| Sep-03 | 2.0% | 2.0% |
| Oct-03 | 2.5% | 2.5% |
| Nov-03 | 2.5% | 2.5% |
| Dec-03 | 2.5% | 2.5% |
| Jan-04 | 2.5% | 2.5% |
| Feb-04 | 2.5% | 2.5% |
| Mar-04 | 3.5% | 3.5% |
| Apr-04 | 3.5% | 3.5% |
| May-04 | 4.0% | 4.0% |
| Jun-04 | 4.5% | 4.5% |
| Jul-04 | 5.0% | 5.0% |
| Aug-04 | 5.0% | 5.0% |
| Sep-04 | 5.0% | 5.0% |
| Oct-04 | 6.0% | 6.0% |
| Nov-04 | 7.0% | 7.0% |
| Dec-04 | 9.0% | 9.0% |
| Jan-05 | 9.0% | 9.0% |
| Feb-05 | 8.0% | 8.0% |
| Mar-05 | 7.5% | 7.5% |
| Apr-05 | 8.0% | 8.0% |
| May-05 | 10.0% | 10.0% |
| Jun-05 | 10.5% | 10.5% |
| Jul-05 | 9.5% | 9.5% |
| Aug-05 | 10.5% | 10.5% |
| Sep-05 | 11.5% | 11.5% |
| Oct-05 | 13.0% | 13. 0% |
| Nov-05 | 16.0% | 16.0% |
| Dec-05 | 18.5% | 18.5% |
| Jan-06 | 13.5% | 13.5% |
| Feb-06 | 12.0% | 12.0% |
| Mar-06 | 12.5% | 12.5% |
| Apr-06 | 12.5% | 12.5% |
| May-06 | 13.5% | 13.5% |
| Jun-06 | 15.0% | 15.0% |

| Month | BNSF | UP |
|---|---|---|
| Jul-06 | 16.5% | 16.5% |
| Aug-06 | 16.5% | 16.5% |
| Sep-06 | 17.0% | 17.0% |
| Oct-06 | 18.0% | 18.0% |
| Nov-06 | 15.5% | 15.5% |
| Dec-06 | 13.0% | 13.0% |
| Jan-07 | 13.0% | 13.0% |
| Feb-07 | 14.0% | 14.0% |
| Mar-07 | 12.5% | 12.5% |
| Apr-07 | 12.5% | 12.5% |
| May-07 | 14.5% | 14.5% |
| Jun-07 | 16.0% | 16.0% |

61.     The Eastern Railroads also charged customers uniform monthly FSC percentages, which they based on the WTI Index, throughout most of the Relevant Period.  The chart below shows that the FSC percentages charged by the Eastern Railroads for carload shipments varied before the Relevant Period but were identical starting in March 2004 (shortly after the introduction of the AIILF).

**Monthly Surcharge Percentages – Eastern Railroads**

| Month | CSX | NS |
|---|---|---|
| Jun-03 | 2.4% | 2.0% |
| Jul-03 | 2.4% | 2.0% |
| Aug-03 | 3.2% | 2.0% |
| Sep-03 | 3.2% | 2.0% |
| Oct-03 | 3.6% | 2.0% |
| Nov-03 | 2.4% | 2.0% |
| Dec-03 | 3.2% | 2.0% |
| Jan-04 | 3.6% | 2.0% |
| Feb-04 | 4.0% | 2.0% |
| **Mar-04** | **4.8%** | **4.8%** |
| Apr-04 | 4.8% | 4.8% |
| May-04 | 5.6% | 5.6% |
| Jun-04 | 5.6% | 5.6% |
| Jul-04 | 7.2% | 7.2% |
| Aug-04 | 6.4% | 6.4% |
| Sep-04 | 7.2% | 7.2% |
| Oct-04 | 8.8% | 8.8% |
| Nov-04 | 9.2% | 9.2% |

| Month | CSX | NS |
|--------|--------|--------|
| Dec-04 | 12.4% | 12.4% |
| Jan-05 | 10.4% | 10.4% |
| Feb-05 | 8.4% | 8.4% |
| Mar-05 | 9.6% | 9.6% |
| Apr-05 | 10.0% | 10.0% |
| May-05 | 12.8% | 12.8% |
| Jun-05 | 12.4% | 12.4% |
| Jul-05 | 10.8% | 10.8% |
| Aug-05 | 13.6% | 13.6% |
| Sep-05 | 14.4% | 14.4% |
| Oct-05 | 16.8% | 16.8% |
| Nov-05 | 17.2% | 17.2% |
| Dec-05 | 16.0% | 16.0% |
| Jan-06 | 14.4% | 14.4% |
| Feb-06 | 14.8% | 14.8% |
| Mar-06 | 17.2% | 17.2% |
| Apr-06 | 15.6% | 15.6% |
| May-06 | 16.0% | 16.0% |
| Jun-06 | 18.8% | 18.8% |
| Jul-06 | 19.2% | 19.2% |
| Aug-06 | 19.2% | 19.2% |
| Sep-06 | 20.8% | 20.8% |
| Oct-06 | 20.4% | 20.4% |
| Nov-06 | 16.4% | 16.4% |
| Dec-06 | 14.4% | 14.4% |
| Jan-07 | 14.8% | 14.8% |
| Feb-07 | 16.0% | 16.0% |
| Mar-07 | 12.8% | 12.8% |
| Apr-07 | 14.8% | 14.8% |
| May-07 | 15.2% | 15.2% |
| Jun-07 | 16.4% | 16.4% |

62.     In stark contrast to this uniformity FSC percentages, fuel costs as a percentage of operating costs and fuel efficiency differed widely among Defendants.  Absent collusion, it is extremely unlikely that Defendants, in both the west and east, would have identical FSC percentages month after month for over three years.  The fact that Defendants moved in lockstep indicates that Defendants coordinated their behavior and conspired to fix prices for FSCs.  The

advance announcement of each Defendant's FSCs was an important implementation and enforcement mechanism for the conspiracy.

63.     Defendants' use of FSCs tied to a percentage of the total base rate rather than the actual cost of fuel allowed them to over-recover their actual fuel costs.  An independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity found that the difference between Defendants' FSC revenue (as publicly reported or estimated) and Defendants' publicly reported actual fuel costs during the period from 2003 through the first quarter of 2007 came to over $6 billion.

64.     Defendants' behavior in implementing their uniform FSC programs advanced their collusive interest but was inconsistent with Defendants' individual self-interest.  In a competitive environment free of coordination, a carrier with lower fuel costs could impose a lower surcharge and increase market share at the expense of competing railroads.  Similarly, if a competitor increased its surcharge prices, another carrier could maintain its current prices and attract market share away from its now-higher-priced competitor.  Defendants did not engage in such competitive behavior, but instead adhered to their agreed-upon uniform FSC pricing based on the total base rate of a shipment.

### OTHER ELEMENTS OF THE CONSPIRACY

65.     At or about the time Defendants agreed to fix FSC prices, Defendants took additional steps to further the conspiracy.

66.     First, Defendants largely switched from offering long-term contracts to offering contracts that were re-priced as often as monthly.  Before the Relevant Period, Defendants had allowed, and often preferred, long-term contracts for up to five years with clauses that limited rate increases, usually governed by the AII or the RCAF, or that excluded fuel surcharges altogether.

Switching contract lengths allowed Defendants to quickly adjust pricing to prevent defections from cartel pricing.

67.     Defendants switched away from long-term contracts even though most shippers preferred the former system to minimize risk and make costs more predictable.  In a competitive environment, forcing customers to assume the greater risks of short-term contracts without any offsetting benefit (such as lower prices) would cause customers to seek alternatives, which would in turn promote competition among carriers.  Here, all Defendants raised their prices and did not offer any compensation to customers for assuming the additional risk of short-term contracts.  Similarly, in a competitive market, one would expect that the railroads would seek, as they had in the past, to reduce their own risks and lock in market share by entering into long-term contracts.  Defendants, however, collectively refused to offer long-term contracts and took no steps (other than their conspiracy) to minimize their own risks from fluctuations in demand.  This coordinated behavior was hardly routine market conduct.

68.     Second, in furtherance of the conspiracy, Defendants declined to negotiate individual discounts on FSCs and overall contract rates, even though prior to mid-2003 it had been customary for Defendants at least to entertain such negotiations.  Shippers from many industries, some with significant economic power, tried to negotiate their FSC percentages during the Relevant Period, but Defendants told them that FSCs were not negotiable.  For example, in December 2002, before the conspiracy began, rail customer U.S. Magnesium negotiated out of the application of an FSC with UP.  *Rail Freight*, 292 F. Supp. 3d at 100.  One year later, after the conspiracy had begun, U.S. Magnesium was unable to reach the same result; it was informed that "all contracts without fuel language will have fuel language upon renewal.  This is a mandate by UP management."  *Id.* at 100, 104.

21

69.     NS Vice President David Lawson admitted that "there was a policy [at NS] to apply the standard fuel surcharge to as many customers as possible." *Id.* at 104.  CSX noted in its 2005 10-K filing that "As existing contracts are renewed or new contracts are executed, CSX is increasing the number of contracts which include fuel surcharge mechanisms."  BNSF's Kyei sent an internal email explaining that contracts requiring the CEO's signature "but excluding full fuel surcharge provisions [would] not be signed." *Rail Freight*, 292 F. Supp. 3d at 104.  This refusal to negotiate aided Defendants in standardizing and monitoring pricing.

70.     Third, in furtherance of the conspiracy, Defendants decreased the use of "through rates," in which a customer would receive a single bill from either the originating railroad or the terminating railroad for routes involving more than one railroad.  Instead, Defendants increasingly had rates billed separately for each railroad on such routes.  Defendants made this change, which could only have resulted from their collective action, as part of their conspiracy for two reasons: to provide transparency as to what each railroad was charging on multiple-line shipments and to allow each Defendant to bill separately for its applicable FSC.

71.     Fourth, in furtherance of the conspiracy, Defendants agreed that none of them would undercut agreed pricing or steal market share by discounting rates (which their increased revenues could have subsidized).  Defendants' market shares remained stable following their 2003 agreements.

### THE STB DECISION

72.     The STB oversees rate-regulated freight traffic in the United States, which is outside the scope of this complaint but was also subjected to Defendants' FSCs.  The STB issued an administrative decision on January 25, 2007 concluding that the railroads' practice of computing FSCs as a percentage of the base rate was an "unreasonable practice" because a fuel

surcharge "that is tied to the level of the base rate, rather than to fuel consumption . . . stands virtually no prospect of reflecting the actual increase in fuel costs for handling the particular traffic to which the surcharge is applied." *Rail Fuel Surcharges*, STB Ex Parte No. 661, at 6 (Jan. 5, 2007).

73.     The STB's decision addressed rate-regulated rail freight traffic only; the STB expressly stated that its jurisdiction did not reach rail freight traffic under private contract or otherwise exempted from rate regulation.  Pursuant to their conspiracy, Defendants applied the same unreasonable fuel surcharge practices addressed by the STB to the private rail freight transportation contracts, and other unregulated freight transport, at issue in this case.

74.     In response to this scrutiny of their FSC programs, Defendants began to differentiate their surcharge rates in order to further obscure and cover up their conspiracy. Defendants' unlawful conspiracy continued to impact rail freight contracts, including CUSA's, until at least the end of 2008.

## DEFENDANTS' SUPRACOMPETITIVE PROFITS

75.     Defendants reaped huge, supracompetitive profits as a result of the success of their conspiracy.  Through their agreement to coordinate their FSCs, Defendants realized billions of dollars in revenues in excess of their actual fuel costs.  In August 2005, UP executive Mark J. Draper emailed that UP's senior finance management held the position that the proposed fuel surcharge was "not some 'trying to make whole' value," and other UP employees saw "nothing wrong with recovering at a rate greater than 100%." *Rail Freight*, 292 F. Supp. 3d at 114.  In June 2004, CSX Commercial Finance Director Erik Palm emailed that "If we had 100% fuel surcharge coverage, we would actually be recovering twice the incremental fuel expense above the surcharge

trigger point." *Id.* Defendants obtained these supracompetitive profits at the expense of CUSA and other customers on whom Defendants imposed their FSCs during the Relevant Period.

76.     Defendants reported increased revenues attributable to FSCs in their public filings during the conspiracy. NS reported a revenue increase of $1.2 billion in its 10-K for the 2005 fiscal year and stated that "Approximately one-third of the revenue increase was due to higher fuel surcharge amounts." Norfolk Southern Corp., 10-K at K21 (Feb. 21, 2006). That same year, CSX reported a revenue per unit increase of "10%, or $105, of which approximately . . . 50% was due to the Company's fuel surcharge program and traffic mix." CSX Corp., 10-K at 14 (Feb. 24, 2006). UP reported that its "fuel surcharge programs generated $1 billion in commodity revenue" in 2005. Union Pacific Corp., 10-K at 20 (Feb. 24, 2008). BNSF's "Freight revenues in 2005 included fuel surcharges of approximately $1.1 billion compared with approximately $350 million in the prior year." BNSF, 10-K at 17 (Feb. 17, 2006).

77.     During the Relevant Period, Defendants increased their market capitalization from approximately $40 billion to approximately $105 billion. The AAR Policy and Economics Department reported that railroad total operating revenue in the United States increased from $36.6 billion in 2003 to over $52 billion in 2006. These dramatic increases are at least in part attributable to FSC revenue realized by Defendants through their price-fixing conspiracy.

78.     Private third-party research also assessed the scale of the scheme. A 2007 independent study commissioned by the American Chemistry Council and Consumers United for Rail Equity found that during the period from 2003 through the first quarter of 2007, Defendants' FSC revenue (as publicly reported or estimated) exceeded Defendants' publicly reported actual fuel costs by over $6 billion.

79.     Because of Defendants' unlawful conduct, the FSCs that Defendants charged CUSA for unregulated rail freight transportation were fixed or stabilized at supracompetitive levels.  Defendants' conspiracy deprived CUSA of the benefits of free, open, and unrestricted competition in the market for unregulated rail freight transportation and unlawfully restrained, suppressed, and eliminated competition in establishing the prices paid in the United States for unregulated rail freight transportation throughout the Relevant Period.

80.     CUSA sustained injury to their business or property as a direct result of Defendants' violations of Section 1 of the Sherman Act and Section 4 of the Clayton Act.  CUSA was injured by paying supracompetitive prices for unregulated rail freight transportation throughout the United States as a result of Defendants' illegal contract, combination, and conspiracy to restrain trade. The federal laws were designed to punish and prevent the type of antitrust injury that CUSA suffered here.

**COUNT I**

**<u>Violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act</u>**

81.     CUSA incorporates by reference the allegations in the paragraphs above as if they were fully set forth herein.

82.     Defendants entered into and engaged in a contract, combination, or conspiracy in unreasonable restraint of trade in violation of Section 1 of the Sherman Act and Section 4 of the Clayton Act.

83.     The contract, combination, or conspiracy resulted in an agreement, understanding, or concerted action between and among Defendants in furtherance of which Defendants fixed, maintained, and standardized prices for FSCs for rail freight transportation handled through private contracts and other means exempt from regulation.  Such contract, combination, or conspiracy

constitutes a per se violation of the federal antitrust laws and is an unreasonable and unlawful restraint of trade.

84.     Defendants' contract, combination, agreement, understanding, or concerted action occurred within the flow of, and substantially affected, interstate and international commerce. Defendants' unlawful conduct was through mutual understandings or agreements between Defendants.

85.     Defendants' contract, combination, or conspiracy has had at least the following effects:

    a.     Prices charged to CUSA for FSCs applied to unregulated rail freight transportation were fixed and/or maintained at supracompetitive levels;

    b.     CUSA has been deprived of the benefits of free, open, and unrestricted competition in the market for rail freight transportation services; and

    c.     Competition in establishing the prices paid, customers of, and territories for rail freight transportation services has been unlawfully restrained, suppressed, and eliminated.

86.     As a proximate result of the conspiracy described herein, CUSA paid FSCs in connection with unregulated rail freight transportation services that it would not have paid in the absence of the conspiracy, and the prices that CUSA paid to Defendants during the Relevant Period for the unregulated rail freight transportation services on which FSCs were imposed were greater than the prices that CUSA would have paid absent the conspiracy alleged herein.

87.     CUSA has been injured in its business and property by reason of Defendants' antitrust violations.

WHEREFORE, CUSA prays for relief as follows:

(1)     That the unlawful contract, combination, and conspiracy alleged in Count I be adjudged and decreed to be an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act;

(2)     That CUSA recover compensatory damages, as provided by law, determined to have been sustained by CUSA, and that judgment be entered against Defendants on behalf of CUSA;

(3)     That CUSA recover treble damages, as provided by law;

(4)     That CUSA recover its costs of the suit, including attorneys' fees, as provided by law; and

(5)     For such further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, CUSA demands a jury trial as to all issues triable by a jury.

Dated:  January 15, 2021                            Respectfully submitted,

                                    By:     SHEARMAN & STERLING LLP

                                            */s/ David P. Whittlesey*
                                            David P. Whittlesey
                                            Attorney-in-Charge
                                            Texas State Bar No. 00791920
                                            Southern District of Texas Bar No. 18086
                                            Email: david.whittlesey@shearman.com
                                            300 West 6th Street, 22nd Floor
                                            Austin, TX 78701
                                            Telephone: (512) 647-1907
                                            Facsimile: (512) 857-6602

                                            Of Counsel:

                                            David A. Higbee (*pro hac vice forthcoming*)
                                            Email: david.higbee@shearman.com
                                            Todd Stenerson (*pro hac vice forthcoming*)
                                            Email: todd.stenerson@shearman.com
                                            Djordje Petkoski (*pro hac vice forthcoming*)
                                            Email: djordje.petkoski@shearman.com
                                            Jonathan Mincer (*pro hac vice forthcoming*)
                                            Email: jonathan.mincer@shearman.com
                                            401 9th Street, NW
                                            Washington, DC 20004
                                            Telephone: (202) 508-8071
                                            Facsimile: (202) 661-7321

                                            *Attorneys for Plaintiff Chevron U.S.A. Inc.*